[Cite as *State v. Slaughter*, 2026-Ohio-2637.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | C.A. No. 30675 |
| Appellee | : | |
| | : | Trial Court Case No. 24CRB3078 |
| v. | : | |
| | : | (Criminal Appeal from Municipal Court) |
| ALBERT SLAUGHTER | : | |
| | : | **FINAL JUDGMENT ENTRY &** |
| Appellant | : | **OPINION** |
| | : | |

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on July 10, 2026, the judgment of the trial court is affirmed.

Costs to be paid as stated in App.R. 24.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately send a copy of the court's ruling to each party and note that action on the docket. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.

For the court,

_____
ROBERT G. HANSEMAN, JUDGE

TUCKER, J., and EPLEY, J., concur.

OPINION

CHRIS BECK, Attorney for Appellant
ASHLYN N.W. BIDDLE, Attorney for Appellee

HANSEMAN, J.

{¶ 1} Appellant Albert Slaughter appeals from his convictions in the Dayton Municipal Court following a bench trial on charges of obstructing official business, falsification, failure to disclose personal information, and menacing. In support of his appeal, Slaughter contends that his trial counsel provided ineffective assistance by failing to file a motion to suppress arguing that he was illegally detained by the police in violation of his Fourth Amendment rights. Slaughter also claims that his convictions were not supported by sufficient evidence. For the reasons outlined below, we disagree with Slaughter's claims and affirm the judgment of the trial court.

**Facts and Course of Proceedings**

{¶ 2} On September 25, 2024, Slaughter was charged by complaint with obstructing official business in violation of R.C. 2921.31(A), falsification in violation of R.C. 2921.13(A)(3), failure to disclose personal information in violation of R.C. 2921.29(A)(1), and menacing in violation of R.C. 2903.22(A)(1). Slaughter pleaded not guilty to all the charged offenses, and the matter proceeded to a bench trial. At trial, the State presented testimony from Officers Chelsea Weitz and Richard Thimmes of the Dayton Police Department. The State also presented video evidence taken from the officers' body and cruiser cameras. Slaughter testified in his defense.

{¶ 3} The officers testified that on night of September 24, 2024, they were dispatched to 340 Kenwood Avenue in Dayton, Ohio, after a caller reported that a male and female were

2

arguing inside a gray vehicle that was parked in front the Kenwood address. The caller also reported that the male and female had a large bag of guns. When the officers arrived at the Kenwood address, they observed a man and a woman sitting inside a gray vehicle in front of the residence, just as described by the caller.

{¶ 4} The body camera videos admitted into evidence showed that Officers Weitz and Thimmes pulled their police cruiser into a residential neighborhood on the night in question. The officers exited the police cruiser and walked up to a gray vehicle parked on the side of a street. Because it was dark outside, the officers had flashlights and shined them on the vehicle. Thimmes approached the driver's side of the vehicle, where the woman was seated, and Weitz approached the passenger's side of the vehicle where the man, Slaughter, was seated. The officers observed a young child lying on Slaughter's lap. When the officers approached, Thimmes told Slaughter and the woman that someone had called and reported that there were people screaming in a gray vehicle in front of the residence where they were parked.

{¶ 5} As the officers tried to explain why they had approached, Slaughter immediately became defensive and argued with the officers. Slaughter voluntarily opened the passenger-side door to the vehicle so that Weitz could see the young child lying on his lap. Slaughter remained seated in the vehicle with the door open and proceeded to tell the officers that it was "weird" for them to approach their vehicle. State's Ex. 1, 1:41-1:43. Thimmes then explained that the caller had reported guns being present. In response, Slaughter and the woman denied having any guns and claimed that the officers were lying. Slaughter also accused the officers of bothering them for no reason and displayed a hostile attitude toward the officers.

3

{¶ 6} While Slaughter was arguing with Weitz, Thimmes told the woman, "Can you just go ahead and step out of the vehicle for me, ma'am." State's Ex. 1, 2:16-2:17; State's Ex. 3, 2:20-2:22. In response, she asked, "For what?" and Thimmes responded, "Because of his behavior essentially." State's Ex. 3, 2:23-2:27. A few seconds later, the woman exited the vehicle and continued speaking with Thimmes. Slaughter, however, remained seated in the vehicle and continued arguing with Weitz.

{¶ 7} While arguing with Weitz, Slaughter asked for the officers' supervisor. In response, Weitz told Slaughter that he could speak to their supervisor and then made a call on her police radio requesting her supervisor's presence. Weitz then asked Slaughter, "Do you have an ID on you, bud?" In response, Slaughter said, "No, why do I gotta have an ID?" State's Ex.1, 3:43-3:46. A few moments later, Slaughter stepped out of the vehicle without being asked and told Weitz that he wanted her to search both him and the vehicle.

{¶ 8} As Weitz was preparing to conduct a pat-down search on Slaughter, two additional police officers arrived at the scene. As the two officers approached, one of them saw Slaughter and shouted, "Albert Slaughter." *Id*. at 4:10. In response, Slaughter said, "No, my name is not Albert Slaughter." *Id*. at 4:11-4:15. One of the officers then asked Slaughter, "What is your name?" Slaughter responded, "I ain't got to tell you all my name." The officer then said, "Yeah you do actually." Slaughter responded, "No I don't. Because what. What we do? What we do?" *Id*. at 4:31-4:40.

{¶ 9} Weitz testified that, at that point in time, Slaughter was required to identify himself because the officers were investigating the anonymous call and she had observed an open container of liquor on the passenger-side floorboard of the vehicle. November 4, 2024 Trial Tr. ("Tr.") 41. Weitz explained that having an open container of liquor in a vehicle is a misdemeanor offense. *Id*. Weitz further testified that Slaughter's failure to give his

personal information hampered their investigation because she and the other officers "weren't able to look him up and move on with the investigation." Tr. 50.

{¶ 10} After Slaughter failed to identify himself, two officers walked Slaughter to a police cruiser while holding each of his arms. When they got to the police cruiser, Slaughter stood at the door and argued with the officers while they were telling him to have a seat. Slaughter eventually sat down with his legs hanging outside of the police cruiser. Slaughter ignored multiple commands to slide his legs into the police cruiser and continued to argue with the officers. Weitz eventually placed Slaughter's legs inside the police cruiser and shut the door. Slaughter was later handcuffed inside the police cruiser and arrested.

{¶ 11} While Slaughter was handcuffed in the back of the police cruiser, the cruiser camera recorded Slaughter screaming obscenities at Weitz and Thimmes. At one point, Slaughter screamed the following at Weitz: "This pussy ass bitch right here acting like she tough. I smack the fuck out of you. Pussy. Acting like you you you tough now? You tough? You tough? But bitch you know if we was out here in these streets by ourselves bitch I'd do something crazy to you. You pussy." State's Ex. 2, 13:07-13:26.

{¶ 12} As Slaughter continued yelling obscenities in the backseat of the police cruiser, Weitz asked Slaughter, "What's your address?" Slaughter responded, "Fuck you, pussy. Figure it out." *Id*. at 15:29-15:33. Weitz then asked Slaughter, "What's your phone number?" Slaughter responded, "Ya mama's number." *Id*. at 15:37-15:40. Weitz asked, "Are you Albert Slaughter?" Slaughter responded, "I ain't got nothing to say to you pussies. Figure it out." *Id*. at 15:45-15:56. Weitz once again asked, "What's your name?" Slaughter responded, "Dick Pussy." *Id*. at 17:08-17:13.

{¶ 13} The cruiser camera video also captured Slaughter screaming the following comments to Thimmes: "You a pussy boy shut your bitch ass up. Nigga will smack your bitch

5

ass. If we was out in the streets and I caught you at any type of like El Toro's[1] or something, nigga I smack your bitch ass. You a bitch." *Id*. at 23:28-23:42. At trial, Thimmes indicated that the specificity of Slaughter's threat stood out in his mind and caused him to worry for his safety in the sense that Slaughter might assault him if he saw him in a public place. Tr. 57.

{¶ 14} Slaughter testified and confirmed that he had not given the officers his name upon request. He also acknowledged that he "wouldn't have been charged . . . if [he] would have just told them [his] name right then and there." Tr. 67. Slaughter explained that he had not wanted to give the officers his name until he had seen their supervisor because he felt that his rights had been violated. Slaughter, however, testified that he gave the authorities his name as soon as he got to the county jail. In addition, Slaughter testified that he was drunk when he made the comment about El Toro, and he claimed that he had not threatened Thimmes.

{¶ 15} After considering the testimony and video evidence presented at trial, the trial court found Slaughter guilty of all the charged offenses. At sentencing, the trial court imposed a 30-day jail term, suspended 28 days, and gave Slaughter credit for two days served. Slaughter now appeals from his convictions and raises two assignments of error for review.

**First Assignment of Error**

{¶ 16} Under his first assignment of error, Slaughter contends that his trial counsel provided ineffective assistance by failing to file a motion to suppress arguing that he was illegally detained by police officers in violation of his Fourth Amendment rights. We disagree.

---

1. El Toro is a chain of Mexican dine-in restaurants in Dayton.

*Standard of Review*

{¶ 17} This court reviews alleged instances of ineffective assistance of trial counsel under the two-prong analysis set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), which has been adopted by the Supreme Court of Ohio in *State v. Bradley*, 42 Ohio St.3d 136 (1989). Under these cases, in order to prevail on an ineffective-assistance claim, Slaughter must show that his trial counsel rendered deficient performance and that the deficient performance prejudiced him. *Strickland* at 687; *Bradley* at paragraph two of the syllabus. The failure to make a showing of either deficient performance or prejudice defeats a claim of ineffective assistance of counsel. *Strickland* at 697.

{¶ 18} To establish deficient performance, Slaughter must show that his trial counsel's performance fell below an objective standard of reasonable representation. *Id*. at 688. When evaluating counsel's performance, a reviewing court "must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. at 689.

{¶ 19} To establish prejudice, Slaughter must show that there is "a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *State v. Hale*, 2008-Ohio-3426, ¶ 204, citing *Strickland* at 687-688 and *Bradley* at paragraph two of the syllabus. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Bradley* at 142, quoting *Strickland* at 694.

{¶ 20} "[F]ailure to file a suppression motion does not constitute per se ineffective assistance of counsel." (Bracketed text in original.) *State v. Madrigal*, 87 Ohio St.3d 378, 389 (2000), citing *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986). "Rather, to demonstrate ineffective assistance of counsel for failure to file a motion to suppress, a defendant must 'establish that a basis existed to suppress' the evidence in question."

7

*State v. Celaya*, 2025-Ohio-5246, ¶ 20 (2d Dist.), quoting *State v. Adams*, 2004-Ohio-5845, ¶ 35. "'"Thus, the failure to file a motion to suppress constitutes ineffective assistance of counsel only when the record establishes that the motion would have been successful if made."'" *Id.*, quoting *State v. Geralds*, 2025-Ohio-2209, ¶ 25 (1st Dist.), quoting *State v. Rosemond*, 2019-Ohio-5356, ¶ 34 (1st Dist.). "'[E]ven when some evidence in the record supports a motion to suppress,' an appellate court will presume that defense counsel was effective if 'counsel could reasonably have decided that the motion to suppress would have been futile.'" (Bracketed text in original.) *Id.*, quoting *State v. Brown*, 2002-Ohio-5455, ¶ 11 (12th Dist.).

*Police-Citizen Interactions*

**{¶ 21}** Here, Slaughter claims that his trial counsel was ineffective for failing to file a motion to suppress arguing that he was illegally detained by police officers in violation of his Fourth Amendment rights. "[T]he Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures." *Celaya* at ¶ 23, citing *State v. Taylor*, 106 Ohio App.3d 741, 747 (2d Dist. 1995). "This protection, however, is not implicated in every interaction an individual has with a police officer." *Id.*, citing *State v. Schott*, 1997 WL 254141, *2 (2d Dist.). "'The law recognizes three types of police-citizen interactions: 1) a consensual encounter, 2) a brief investigatory stop or detention, and 3) an arrest.'" *Id.*, quoting *State v. Millerton*, 2015-Ohio-34, ¶ 20 (2d Dist.).

**{¶ 22}** "'A consensual encounter is not a seizure, therefore no Fourth Amendment rights are invoked.'" *State v. Scerba*, 2025-Ohio-2791, ¶ 26 (2d Dist.), quoting *State v. Ball*, 2010-Ohio-714, ¶ 14 (11th Dist.), citing *Florida v. Bostick*, 501 U.S. 429, 434 (1991). "'Encounters are consensual where the police merely approach a person in a public place, engage the person in conversation, request information, and the person is free not to answer

and walk away.'" *Id*. at ¶ 25, quoting *Taylor* at 747, citing *United States v. Mendenhall*, 446 U.S. 544, 553 (1980). "'The Fourth Amendment guarantees are not implicated in such an encounter unless the police officer has by either physical force or show of authority restrained the person's liberty so that a reasonable person would not feel free to decline the officer's requests or otherwise terminate the encounter.'" *Id*., quoting *Taylor* at 747-748, citing *Mendenhall* at 554 and *Terry v. Ohio*, 392 U.S. 1, 16, 19 (1968). "Once a person's liberty has been restrained, the encounter loses its consensual nature and falls into one of the other two categories." *Id.,* citing *Taylor* at 748.

{¶ 23} "Unlike consensual encounters, an investigatory detention constitutes a seizure; therefore, Fourth Amendment protections are implicated in an investigatory detention." *State v. Shern*, 2018-Ohio-5000, ¶ 13 (2d Dist.). "[A]n investigatory detention . . . is more intrusive than a consensual encounter but less intrusive than a formal custodial arrest." *Scerba* at ¶ 28, citing *Taylor* at 748. "An individual is subject to an investigatory detention when, by means of physical force or show of authority, a reasonable person would have believed that he or she was not free to leave or was compelled to respond to questions." *Id.*, citing *State v. Lewis*, 2009-Ohio-158, ¶ 22 (2d Dist.), citing *Mendenhall* at 553 and *Terry* at 16, 19.

{¶ 24} "During investigatory detentions, 'police officers may briefly stop and/or temporarily detain individuals in order to investigate possible criminal activity if the officers have a reasonable, articulable suspicion that criminal activity may be afoot.'" *Scerba* at ¶ 29, quoting *State v. Swift*, 2016-Ohio-8191, ¶ 10 (2d Dist.), citing *Terry*. "Therefore, investigatory detentions do not violate the Fourth Amendment 'as long as the police have a reasonable, articulable suspicion of criminal activity.'" *Id.*, quoting *State v. Ramey*, 2016-Ohio-607, ¶ 22, (2d Dist.), citing *Taylor,* 106 Ohio App.3d at 748-749, citing *Terry*.

9

**{¶ 25}** The determination of whether an officer had reasonable suspicion to conduct an investigatory detention "must be based on the totality of circumstances 'viewed through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold.'" *State v. Hairston*, 2019-Ohio-1622, ¶ 10, quoting *State v. Andrews*, 57 Ohio St.3d 86 (1991). "An assessment of the totality of the circumstances 'does not deal with hard certainties, but with probabilities.'" *Id.*, quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981). "'The officer must have more than an inchoate hunch or suspicion to justify an investigatory stop.'" *Scerba*, 2025-Ohio-2791, at ¶ 29 (2d Dist.), quoting *State v. Belvin*, 2014-Ohio-3634, ¶ 8 (2d Dist.).

**{¶ 26}** "A telephone tip, standing alone, can create reasonable suspicion justifying an investigatory stop where the tip has sufficient indicia of reliability." *State v. Works*, 2003-Ohio-4720, ¶ 18 (2d Dist.), citing *Maumee v. Weisner*, 87 Ohio St.3d 295, 296 (1999). "Factors considered highly relevant in determining the value of an informant's tip are the informant's veracity, reliability, and basis of knowledge." *Id.*, citing *Maumee* and *Illinois v. Gates*, 462 U.S. 213, 230 (1983). "Ohio courts have recognized three categories of informants: (1) citizen informants, (2) known informants, i.e., those from the criminal world who have previously provided reliable tips, and (3) anonymous informants, who are comparatively unreliable." *State v. Reno*, 2017-Ohio-4326, ¶ 20 (2d Dist.), citing *Maumee* at 300.

**{¶ 27}** "'[A]n anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity' in order to justify an investigative stop.'" *Id.*, quoting *Alabama v. White*, 496 U.S. 325, 329 (1990). "'This is not to say that an anonymous caller could never provide the reasonable suspicion necessary for [an investigative] stop.'" (Bracketed text in original.) *State v. Davis*, 2009-Ohio-2538, ¶ 17 (2d Dist.), quoting *Alabama* at 329.

10

"An anonymous tip that is corroborated demonstrates 'sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop.'" *State v. Russell*, 2004-Ohio-1700, ¶ 27, quoting *Florida v. J.L.*, 529 U.S. 266, 270 (2000), citing *Alabama* at 327. Therefore, "[a]n anonymous tip will generally require independent police corroboration." *Works* at ¶ 19, citing *Alabama*.

{¶ 28} "However, 'simple corroboration of neutral details describing the suspect or other conditions existing at the time of the tip, without more, will not produce reasonable suspicion for an investigatory stop.'" *State v. Shepherd*, 122 Ohio App.3d 358, 367 (2d Dist. 1997), quoting *State v. Ramsey,* 1990 WL 135867 (10th Dist. Sept. 20, 1990). "This court has specifically rejected the proposition that 'where, without more, the police observe an individual who meets the physical description provided by the anonymous informant and is found in the location described by the informant, the police have corroboration sufficient to entertain a reasonable and articulable suspicion that the individual was or is involved in criminal activity.'" *Id*., quoting *State v. Harris,* 1994 WL 191403, *3 (2d Dist. May 18, 1994). "Reasonable suspicion requires that the anonymous 'tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person.'" *Russell* at ¶ 27, quoting *J.L.* at 272.

### Analysis

{¶ 29} When Weitz and Thimmes initially approached Slaughter in the parked vehicle and told him and the female occupant why they had approached, the encounter was consensual and did not trigger any Fourth Amendment protections. *See Celaya*, 2025-Ohio-5246, at ¶ 25 (2d Dist.) ("approaching and questioning people seated in a parked vehicle does not constitute a seizure so as to require an officer to have a reasonable suspicion of criminal activity"), citing *State v. Williams*, 2010-Ohio-4277, ¶ 26 (2d Dist.); *State v.*

11

*Woodgeard*, 2002-Ohio-3936, ¶ 34 (1st Dist.) ("'[w]hen a police officer merely approaches a person seated in a parked car, no "seizure" of the person occurs so as to require reasonable suspicion supported by specific and articulable facts'"), quoting *Ball*, 2010-Ohio-714, at ¶ 14 (11th Dist.); *Shern*, 2018-Ohio-5000, at ¶ 18 (2d Dist.) (noting that it has been held that "two police officers did not seize the defendant 'when they parked their car in front of his, approach[ed] him on foot from two sides, and shin[ed] their flashlights in his car.'"), quoting *United States v. Douglass*, 467 F.3d 621, 623-24 (7th Cir. 2006). Specifically, Weitz and Thimmes did not display a show of authority that would have made a reasonable person feel as though they were not free to leave the encounter.

{¶ 30} The consensual nature of the encounter ended, however, when Thimmes ordered the female occupant to exit the vehicle. This is because a reasonable person in her position would not have felt at liberty to decline Thimmes' order. The act of ordering someone out of their vehicle represents a show of authority that communicates to a reasonable person that compliance is required, and they are not free to leave. *See State v. Santiago,* 2002-Ohio-1469, ¶ 16 (11th Dist.) (holding that "asking [the defendant] to step out of her vehicle exceeded the scope of a consensual encounter" because "[a] reasonable person would not feel they were at liberty to decline the officer's request"); *Shern* at ¶ 27 (where an officer approached a parked vehicle with a flashlight and asked to see the occupants' hands in response to a call reporting screaming coming from a parked vehicle, the encounter remained consensual until the officer ordered the occupants out of the vehicle). Therefore, once Thimmes had the woman exit the vehicle, the encounter turned into an investigatory detention.

{¶ 31} Even though Slaughter was a passenger and was never asked to exit the vehicle, he was equally seized and his freedom of movement was equally affected when

12

Thimmes ordered the driver to exit the vehicle. *See State v. Carter*, 1993 WL 24777, *5 (2d Dist. Feb. 4, 1993), *aff'd*, 69 Ohio St.3d 57 (1994) ("[b]oth passengers and the driver have standing regarding the legality of a stopping because when the vehicle is stopped, they are equally seized, and their freedom of movement is equally affected"); *State v. Granados*, 2014-Ohio-1758, ¶ 59 (5th Dist.) ("all people within the stopped vehicle are equally seized and their freedom of movement equally detained"); *State v. Prater*, 2012-Ohio-5105, ¶ 24 (2d Dist.) ("[e]ven though he was a passenger in the vehicle, [the defendant] was equally seized and has standing to challenge the unlawful detention"), citing *Brendlin v. California*, 551 U.S. 249 (2007). Therefore, Slaughter's encounter with the officers became an investigatory detention once Thimmes ordered the woman out of the vehicle.

{¶ 32} Having determined that Slaughter's encounter with the officers became an investigatory detention once Thimmes ordered the woman out of the vehicle, we must determine whether the officers had reasonable suspicion of criminal activity at that point in time to justify the detention. The officers had approached Slaughter and the woman in response to a dispatch prompted by a caller reporting that a male and female were arguing in a gray vehicle parked at a specific location and that the male and female had a bag of guns. It is unclear from the record whether the caller had identified him or herself. Absent any evidence indicating otherwise, we presume that the caller was anonymous.

{¶ 33} The record establishes that the anonymous call was partially corroborated in that Weitz and Thimmes observed a man and a woman sitting in a gray vehicle parked in front of the address reported by the caller. The video evidence also establishes that Weitz had heard some yelling when she and Thimmes pulled up to the scene. State's Ex. 1, 3:21-3:26. However, both officers testified that they had observed no guns during the encounter.

13

{¶ 34} When considering the nature of the anonymous call and the corroborated details from the anonymous call in conjunction with the other circumstances surrounding the officers' encounter with Slaughter, we find that a reasonable, prudent police officer at the scene would have had a reasonable suspicion of criminal activity or, at the very least, would have felt the need to detain Slaughter to conduct a welfare check. *See State v. Smith*, 2015-Ohio-1204, ¶ 18 (11th Dist.) (an officer's "decision to detain [the defendant] until the well-being of his child's mother was confirmed was entirely consistent with the stated purpose of a valid *Terry* stop"). We reach this conclusion because when the officers first approached, it was 11:52 p.m. and Slaughter and the woman were just sitting in a parked vehicle with a young child on Slaughter's lap. Although that by itself is not suspicious, Slaughter's immediate argumentative demeanor toward the officers was.

{¶ 35} The video evidence establishes that Slaughter's immediate argumentative demeanor toward the officers was strange and unprovoked. The officers simply walked up and told Slaughter and the female occupant about the call they had received. The officers were not aggressive. Despite this, Slaughter was immediately argumentative with the officers. Slaughter remained argumentative even after the female occupant tried to get him to stop arguing, and even after Weitz told him that she would get her supervisor per his request. Slaughter's unprovoked, argumentative demeanor during the officer's consensual encounter was suspicious, and Thimmes specifically told the female occupant that he had her exit the vehicle because of Slaughter's behavior. Slaughter's strange behavior combined with the nature of the anonymous call, the corroborated details of the anonymous call, and the late hour would have caused a reasonable police officer to suspect possible criminal activity or, at the very least, the need to detain Slaughter to conduct a welfare check.

14

{¶ 36} We also note Weitz's testimony that Slaughter was detained not only because the officers were investigating the anonymous call but also because the officers had seen an open container of liquor on the passenger-side floorboard of the vehicle—a minor misdemeanor offense. *See* R.C. 4301.62(B)(4); R.C. 4301.99. Weitz's testimony is unclear as to when the officers observed the open container. The video evidence, however, indicates that the open container was likely observed after the investigatory detention had already commenced. Regardless, when considering the late hour, the nature of the anonymous call, the corroborated details of the anonymous call, and, most importantly, Slaughter's unprovoked, argumentative behavior toward the officers, we find that the officers lawfully detained Slaughter based on the reasonable suspicion of criminal activity and/or the need for a welfare check. Furthermore, Slaughter's continued refusal to identify himself during the investigatory detention entitled the officers to arrest him.

{¶ 37} For all the foregoing reasons, we find that Slaughter was not illegally detained by the police officers and that a motion to suppress claiming otherwise would not have been successful. As a result, it cannot be said that counsel's failure to file such a motion prejudiced Slaughter. Without a showing of prejudice, Slaughter's ineffective assistance claim necessarily fails.

{¶ 38} Slaughter's first assignment of error is overruled.

## Second Assignment of Error

{¶ 39} Under his second assignment of error, Slaughter contends that each of his convicted offenses were not supported by sufficient evidence and therefore should be reversed. We disagree.

### Standard of Review

{¶ 40} "'When a defendant challenges the sufficiency of the evidence, [he] is arguing

15

that the State presented inadequate evidence on an element of the offense to sustain the verdict as a matter of law.'" (Bracketed text in original.) *State v. Humphreys*, 2026-Ohio-373, ¶ 54 (2d Dist.), quoting *State v. Matthews*, 2018-Ohio-2424, ¶ 7 (2d Dist.). "'An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *Matthews* at ¶ 7, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. "The verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier-of-fact." *State v. Dennis*, 79 Ohio St.3d 421, 430 (1997), citing *Jenks* at 273.

*Obstructing Official Business*

{¶ 41} Slaughter was convicted of obstructing official business in violation of 2921.31(A). That statute provides: "No person, without privilege to do so and with purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within the public official's official capacity, shall do any act that hampers or impedes a public official in the performance of the public official's lawful duties." R.C. 2921.31(A).

{¶ 42} "To be guilty of the offense of obstructing official business, an individual must commit an overt act done with an intent to obstruct a public official, such as a police officer, and the act must succeed in actually hampering or impeding that officer." *State v. Easterling*, 2019-Ohio-2470, ¶ 35 (2d Dist.), citing *State v. Davis*, 2017-Ohio-5613, ¶ 37 (2d Dist.). "'The proper focus in a prosecution for obstructing official business is on the defendant's conduct,

16

verbal or physical, and its effect on the public official's ability to perform the official's lawful duties.'" *Id*., quoting *State v. Henry*, 2018-Ohio-1128, ¶ 55 (10th Dist.).

{¶ 43} "We have stated that verbal acts alone, including the provision of false identification or statements, can constitute obstructing official business." *Id.* at ¶ 41, citing *State v. Gibson*, 2019-Ohio-1022, ¶ 18 (2d Dist.) and *State v. Fader*, 2018-Ohio-4139, ¶ 18 (2d Dist.) (State presented sufficient evidence of obstructing official business based on defendant's provision of false identity). The Supreme Court of Ohio has held that "[t]he making of an unsworn false oral statement to a public official with the purpose to mislead, hamper or impede the investigation of a crime is punishable conduct within the meaning of R.C. 2921.13(A)(3) and 2921.31(A)." *State v. Lazzaro*, 76 Ohio St.3d 261 (1996), paragraph one of the syllabus. It is also within a police officer's rights to arrest a defendant for obstructing official business where the defendant repeatedly refuses to comply with the officer's instructions. *Dayton v. Turic*, 2005-Ohio-131, ¶ 26 (2d Dist.).

{¶ 44} In this case, the State presented testimony and video evidence establishing that Slaughter continually failed to provide police officers with his name despite multiple requests from the officers. Weitz testified that Slaughter's failure to give his personal information hampered the investigation because she and the other officers "weren't able to look him up and move on with the investigation." Tr. 50. Also, when the officers escorted Slaughter to the police cruiser, he argued with the officers and failed to follow several commands to place his legs inside the police cruiser. The video evidence established that Weitz had to place Slaughter's legs into the police cruiser for him. Nothing in the record indicates that Slaughter had any privilege to obstruct or hamper the officers' lawful investigation.

17

{¶ 45} When viewing the aforementioned testimony and video evidence in a light most favorable to the State, we find that any rational trier of fact could have concluded beyond a reasonable doubt that Slaughter committed the offense of obstructing official business in violation of R.C. 2921.31(A). Accordingly, his conviction for that offense was supported by sufficient evidence.

*Falsification*

{¶ 46} Slaughter was also convicted of falsification in violation of R.C. 2921.13(A)(3). That statute provides: "No person shall knowingly make a false statement, or knowingly swear or affirm the truth of a false statement previously made, when . . . [t]he statement is made with purpose to mislead a public official in performing the public official's official function." R.C. 2921.13(A)(3).

{¶ 47} In this case, the evidence established that Slaughter stated to the officers that his name was not Albert Slaughter and later claimed that his name was "Dick Pussy." The evidence therefore established that Slaughter knowingly made false statements to the officers. Because Slaughter's false statements provided misinformation about his identity, we find that a reasonable trier of fact could have concluded that Slaughter meant to mislead the officers in the performance of their duty to identify him.

{¶ 48} Slaughter argues that he cannot be found guilty of falsification because the video evidence established that one of the officers already knew he was Albert Slaughter. The record, however, does not support this claim. Although one of the additional officers who arrived at the scene shouted "Albert Slaughter" when the officer first approached, there is no testimony indicating that the officer knew for sure that it was Slaughter. Instead, the officers continued to ask Slaughter for his name during the encounter. Slaughter himself

18

testified that "they said, Albert Slaughter and I told them, that ain't my name, but it was my name." Trial Tr. 69.

{¶ 49} In any event, the officers' knowledge is irrelevant to the falsification offense, as Slaughter was simply required to knowingly make a false statement to the officers with the purpose to mislead them in the performance of their official duties. The State presented evidence establishing just that. Therefore, a rational trier of fact viewing that evidence in a light most favorable to the State could have concluded that Slaughter was guilty of falsification beyond a reasonable doubt. As a result, Slaughter's conviction for falsification was supported by sufficient evidence.

*Failure to Disclose Personal Information*

{¶ 50} In addition to obstructing official business and falsification, Slaughter was convicted of failure to disclose personal information in violation of R.C. 2921.29(A)(1). That statue provides, "No person who is in a public place shall refuse to disclose the person's name, address, or date of birth, when requested by a law enforcement officer who reasonably suspects [that] the person is committing, has committed, or is about to commit a criminal offense." R.C. 2921.29(A)(1). "This subsection of R.C. 2921.29 applies to questioning in the context of an investigative detention and not to questions asked during a consensual encounter." *State v. Blair*, 2023-Ohio-88, ¶ 21 (2d Dist.), citing *State v. Crump*, 2021-Ohio-2574, ¶ 17 (1st Dist.).

{¶ 51} In this case, the evidence established that Slaughter refused to disclose his name to officers during a lawful investigatory detention that took place in a public, residential area. As discussed under Slaughter's first assignment of error, based on the totality of the circumstances, the officers had reasonable suspicion to believe that Slaughter was possibly engaging in criminal activity. The video evidence of the investigatory detention established

19

that Slaughter specifically told the officers that his name was not Albert Slaughter and thereafter refused to give the officers his name when asked.

{¶ 52} When viewing the evidence in a light most favorable to the State, we find that a rational trier of fact could have concluded beyond a reasonable doubt that Slaughter committed the offense of failure to disclose personal information in violation of R.C. 2921.29(A)(1). Accordingly, his conviction for that offense was supported by sufficient evidence.

*Menacing*

{¶ 53} Lastly, Slaughter was convicted of menacing in violation of R.C. 2903.22(A)(1). In relevant part, that statute prohibits a person from "knowingly caus[ing] another to believe that the offender will cause physical harm to the person or property of the other person." R.C. 2903.22(A)(1). "The major issues when a threat is made are whether the defendant (1) acted knowingly and (2) caused a person or group to believe they would be harmed." *State v. Gray*, 2022-Ohio-2171, ¶ 11 (2d Dist.), citing *In re P.T.*, 2013-Ohio-3881, ¶ 16 (12th Dist.). "This crime 'can encompass a present state of fear of bodily harm and a fear of bodily harm in the future.'" *P.T.* at ¶ 16, quoting *State v. Scott*, 2009-Ohio-4961, ¶ 20 (7th Dist.).

{¶ 54} "[F]or menacing to be proven, 'a victim need not articulate a precise fear.'" *State v. Whitehead*, 2019-Ohio-5141, ¶ 24 (2d Dist.), quoting *State v. Howard*, 2010-Ohio-5158, ¶ 14 (2d Dist.). "Rather, '[i]t is sufficient for the State to establish the victim's general fear for the safety of [himself], the members of [his] immediate family, and/or [his] property.'" *Id.*, quoting *Howard* at ¶ 14. "For example, in *Howard*, this court found sufficient evidence of fear of physical harm for purposes of establishing menacing where the victims did not articulate any specific fears, but merely repeated that they feared for their safety because they did not know what the defendant might do." *Id.*, citing *Howard* at ¶ 14-15.

20

{¶ 55} In his case, the video evidence established that Slaughter screamed the following at Weitz: "This pussy ass bitch right here acting like she tough. I smack the fuck out of you. Pussy. Acting like you you you tough now? You tough? You tough? But bitch you know if we was out here in these streets by ourselves bitch I'd do something crazy to you. You pussy." State's Ex. 2 at 13:07-13:26.

{¶ 56} Because the State only identified Thimmes, not Weitz, as the victim of menacing in its complaint, Slaughter's threatening statement to Weitz was not considered by the trial court. Instead, the menacing charge was based solely on the following statement that Slaughter had made to Thimmes in the police cruiser: "You a pussy, boy shut your bitch ass up. Nigga will smack your bitch ass. If we was out in the streets and I caught you at any type of like El Toro's or something, nigga I smack your bitch ass. You a bitch." *Id*. at 23:28-23:42. At trial, Thimmes indicated that the specificity of Slaughter's threat stood out in his mind and caused him to worry for his safety in the sense that Slaughter might assault him if he saw him in a public place. Tr. 57.

{¶ 57} When viewing the aforementioned testimony and video evidence in a light most favorable to the State, we find that a rational trier of fact could have concluded beyond a reasonable doubt that, by virtue of his threatening language, Slaughter knowingly caused Thimmes to fear for his physical safety. Accordingly, Slaughter's conviction for menacing was supported by sufficient evidence.

{¶ 58} Because all of Slaughter's convictions were supported by sufficient evidence, his second assignment of error is overruled.

## Conclusion

{¶ 59} Having overruled both of Slaughter's assignments of error, the judgment of the trial court is affirmed.

21

. . . . . . . . . . . . .

TUCKER, J., and EPLEY, J., concur.